

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

February 18, 1958

Hon. William A. Harrison
Commissioner of Insurance
State Board of Insurance
Austin 14, Texas

Opinion No. WW-293-A

Re: Disposition to be made of
insurance company investments
which do not meet qualifica-
tions required by the appro-
priate investment statutes.

Dear Mr. Harrison:

This opinion is given to you in lieu of Opinion No.
WW-293 dated October 31, 1957, which is withdrawn.

You have requested our opinion as to the proper pro-
cedure to be followed under factual situations which involve the
disposition of investments, which do not comply with statutory
requirements, made by various insurance companies. The factual
situations will be discussed in the order stated in your letter
of request.

"1. Section 4 of Article 3.39 provides that a
life insurance company shall not invest more than
10% of its own capital, surplus and contingency
funds in the stock of another corporation. ABC Life
Insurance Company invests 25% of the amount of its
capital, surplus and contingency funds in the capi-
tal stock of another corporation contrary to Section
4 of Article 3.39. Heretofore it has been the prac-
tice of the Board to allow the company to retain the
entire investment, but to non-admit the excess invest-
ment over the statutory limit. Should the Board allow
the Company to retain the investment, but for finan-
cial statement purposes (1) non-admit the entire
amount or (2) non-admit the 15% excess investment over
the amount allowed by the statute; or should the Board
require the company to (3) dispose of the excess in-
vestment or (4) dispose of the entire investment, be-
cause in such amount, it is not permitted by the
statute, and is therefore prohibited?"

Section 4, Article 3.39, Texas Insurance Code, provides
that any life insurance company may invest its capital, surplus
and contingency funds over and above the amount of its policy re-
serves in the capital stock of another corporation, which

corporation must meet certain requirements not here pertinent, provided "that it shall not invest more than ten percent (10%) of the amount of its capital, surplus, and contingency funds in the stock of any one corporation, . . .". You have stated that heretofore it has been the departmental interpretation of this article by your predecessors in office to permit the company to retain the entire investment but to non-admit the excess investment over the statutory limit. We cannot agree with your departmental interpretation.

The language contained in the proviso above quoted is mandatory and specifically prohibits the investment by the company of more than ten percent of the amount of its capital, surplus, and contingency funds in the stock of any one corporation. This portion of the statute is unambiguous. It is our opinion that you should require the insurance company to dispose of all of its investment in the capital stock of the corporation which is in excess of the ten percent of the amount of the capital, surplus, and contingency reserves of the insurance company.

"2. Section 2 of Article 3.39 authorizes a life insurance company to make loans upon first liens upon real estate, the title to which is valid and the value of which is 40% more than the amount of the loan thereon. ABC Life Insurance Company makes a loan of $10,000 secured by a first lien upon real estate which has a value of $10,000, thereby being contrary to provisions of Section 2 of Article 3.39. Heretofore it has been the practice of the Board to allow the Company to retain the entire investment, but to non-admit the excess of the amount of the loan over the statutory limit. Should the Board allow the Company to retain the note, but for financial statement purposes (1) non-admit the excess amount of the loan, (2) non-admit the entire loan, or (3) require the Company to procure the necessary additional security for the loan; or, because the loan is not in fact one which is permitted by the statute, and is therefore prohibited, should the Board (4) require the Company to completely dispose of the asset because it does not comply with the statute?"

Section 2 of Article 3.39, Texas Insurance Code, provides that any life insurance company may lend any of its funds and accumulations in loans upon first liens upon real estate, the title to which is valid and the value of which is forty percent more than the amount loaned thereon. It is clear from this factual situation that the amount of the loan equals one hundred percent of the value of the real estate, thereby violating the express provisions of Section 2. You have stated that it has been

the departmental interpretation of your predecessors to permit the company to retain the entire investment and to non-admit the excess amount of the loan over the statutory limit. This practice we believe to have been in error. It is our opinion that since the making of the original loan was prohibited as a matter of law by the provisions of Section 2, the company should be required to completely dispose of the asset or re-negotiate or readjust the loan so that the investment meets the standards of Section 2. However, for the purposes of determining solvency of the company, that portion of the loan which meets the percentage requirements of the statute should be admitted until the company disposes of the loan, or readjusts it to meet the requirements of the Insurance Code.

"3. Section 4 of Article 3.39 permits a life insurance company to invest its funds in the stock and commercial notes of a corporation which has been in existence for a period of five years next preceding the investment. ABC Life Insurance Company invest its funds in the stock and commercial notes of a corporation which has not been in existence for five consecutive years preceding the investment, which is therefore contrary to Article 3.39. Heretofore it has been the practice of the Board to allow the company to retain such an investment, but to non-admit it for financial statement purposes. Should the Board (1) allow the company to retain the stock and notes, but non-admit them for financial statement purposes, or (2) since the stock and notes do not meet the qualifications of the statute, and are therefore prohibited as investments, should the Board require the Company to dispose of the investments as being contrary to the statute?"

Under the provisions of Section 4, Article 3.39, Texas Insurance Code, any life insurance company may invest its capital, surplus and contingency funds over and above the amount of its policy reserves in the capital stock, bonds, or other commercial notes issued by any solvent corporation which has not defaulted in payment of any debt within five years next preceding such investment. This provision necessarily prohibits the insurance company from investing in the stock or commercial paper of any corporation which has not been in existence for a period of five years next preceding the date of such investment. It appears that the departmental interpretation of Section 2 by your predecessors has been to allow the company to retain the investment but to non-admit it for financial statement purposes. It is our opinion that such departmental construction was in error. The stock and commercial notes of the corporation which has not been

in existence for five consecutive years preceding the date of the investment, being wholly unauthorized as a legal investment under the terms of the statute, you should require the insurance company to dispose of its entire investment in both the stock and the commercial notes.

> "4.  Section 7 of Article 3.39 permits a life insurance company to invest not more than 5% of its admitted assets in the debentures of a public utility corporation.  ABC Life Insurance Company invests more than 5% of its admitted assets in the debentures of a public utility corporation, contrary to Section 7 of Article 3.39.  Heretofore it has been the practice of the Board to allow the Company to retain the entire investment, but to non-admit that part of the investment that exceeds the statutory amount.  Should the Board allow the Company to retain all the debentures, but for financial statement purposes (1) non-admit the excess of the investment over 5% or  (2) non-admit the entire investment because it does not comply with the statute; or, since the actual investment exceeds that amount permitted by the statute, and is therefore prohibited by the statute, should the Board require the Company to (3) dispose of the excess investment over 5% or  (4) dispose of the entire investment because it does not comply with the statute?"

Section 7, Article 3.39, Texas Insurance Code, provides that any life insurance company may invest any of its funds and accumulations in the debentures of a public utility corporation meeting certain requirements, but expressly provides that "in no event shall the amount of such investment in debentures under this subdivision exceed five percent (5%) of the admitted assets of the insurance company making the investment."  The departmental interpretation of Section 7 by your predecessors has been to permit the company to retain the entire investment but to non-admit that part of the investment exceeding the statutory five percent. It is our opinion that this departmental interpretation is incorrect in view of the express prohibition contained in the statute that <u>in no event</u> shall the amount of such investment exceed five percent of the admitted assets of the corporation.  Therefore you should require the company to dispose of its investment in the debentures in excess of five percent of its admitted assets.

> "5.  Article 3.40 provides no life insurance company shall make any investment in a home office building if, after making the investment, the 'total

investment' of the company in its home office
exceeds 33 1/3% of the company's admitted assets.
ABC Life Insurance Company has admitted assets
of $750,000.  The Company pays down $250,000 cash,
takes title to a building worth $500,000, and
gives its note to the vendor for an additional
$250,000.  In determining what is the 'total in-
vestment' of ABC Company in its home office prop-
erty, should the Board (1) look only to the com-
pany's equity in the building of $250,000, or (2)
look to the total of the equity plus the note
given by the Company?  If you are of the opinion
that the Board must look to the total of the equity
plus the amount of the note given by the Company
should the Board  allow the Company to retain the
building, but for financial statement purposes
(1) non-admit the excess investment in the build-
ing, or  (2) non-admit the entire investment; or
should the Board  (3) require the Company to dis-
pose of the home office building because it ex-
ceeds 33 1/3% of the Company's admitted assets,
and is therefore prohibited by statute?

"In the same fact situation as given above,
the company assumes liability on a note for the
remaining $250,000 obligation rather than give its
own note for such amount.  Would your answers to
the above questions still be the same, and if not,
in what regard would they be different?

"In the same fact situation as given above,
the company merely takes title to the building
'subject to' the remaining $250,000 obligation, but
does not assume liability therefor.  Would your an-
swers to the questions in the first paragraph be
the same, and if not, in what regard would they be
different?"

Article 3.40, Texas Insurance Code, permits any insur-
ance company to acquire a home office building, but limits the
investment in such home office building as follows:

"1(b).  No company shall (after the effect-
ive date of this Act) make any investment in the
properties described in paragraph 1(a) above if,
after making such investment, the total investment
of the company in such properties is in excess of
thirty-three and one-third (33 1/3%) percent of its

admitted assets as of December 31st next preceding the date of such investment; provided, however, that such investment may be increased to as much as fifty (50%) percent of the company's admitted assets upon advance approval by the Board of Insurance Commissioners; provided further, that such investment may be further increased if the amount of such additional increase is paid for only from surplus funds and is not included as an admitted asset of the company. . . . . "

It is further provided that the above quoted limitations do not apply to a bona fide investment in home office property actually made by contract, or otherwise, for reasonable and adequate consideration prior to the effective date of the Act. (Acts 1955, 54th Leg., p. 916, ch. 363).

It must be pointed out that there are other provisions of the Code which require life insurance companies to maintain assets of a certain character to the extent of its reserves, capital and surplus and in some instances forbid the holding of real estate to the extent of such items. (See, for example, Article 3.02 and Section 9 of Article 3.39.) Since the applications of these additional restrictions depend upon facts outside the scope of your request, we express no opinion thereon.

The word "investment" is difficult to define, and since it is deemed vague and has acquired no technical definition, the meaning must be determined by the context in which it is used. When used with reference to property, the term involves the idea of intended profit and implies the contractual relation of purchaser and seller or borrower and lender, and a certain measure of permanence in contrast to a speculative or temporary measure. 48 C.J.S. p. 760. Applying the broad general definition to the word "investment" as used in Article 3.40, it seems clear that the term "investment in a home office building" would indicate the amount of capital, whether represented by money or by promissory notes, which the insurance company has obligated itself to pay as a consideration for acquiring the home office building which is to be used for the purpose of making a profit for the insurance company upon the funds expended or to be expended for its purchase. It is also true that when the insurance company executes its note to the vendor of the property for $250,000.00 as part of the purchase price thereof, the company has obligated its assets to that extent and that such obligation would constitute an investment. If the insurance company, having $250,000.00 of its own money, which represents part of its admitted assets, borrowed from a third party an equal amount, then purchased the home office building for $500,000.00 in cash, the purchase price

would represent an investment made by the insurance company in a total amount of $500,000.00.  It is immaterial whether the additional $250,000.00 is represented by a note to the vendor of the property or whether it is represented by a note payable to a third party.

We hold that the term "investment" as used in this Article includes the total cash and notes of the company given for the purchase price.

Under the factual situation given by you, assuming that the ABC Life Insurance Company had no surplus funds, where such company had $750,000.00 in admitted assets and paid down $250,000.00 in cash, taking title to a building worth $500,000.00, and giving its note to the vendor for an additional $250,000.00, the total investment by the company in such a building would be $500,000.00 or two-thirds of its admitted assets.  Such an investment being in excess of the limits permitted by Article 3.40 would be improper and the Board should require the company to dispose of the same, or make such other adjustments as will bring the investment within permissible limits.  For the purposes of determining the solvency of the company, that portion of the investment not in excess of 33 1/3% of its admitted assets should be admitted until the company disposes of the investment or makes such other adjustment as will bring the investment within the permissible limits.

You then request our opinion at to whether the fact that the $250,000.00 note in question was assumed by the company instead of being executed by it would change the status of the investment.  In the alternative, if the company took title to the home office building subject to a $250,000.00 outstanding obligation and did not assume liability for the payment thereof, you ask if the situation would be changed.  The difference between the assumption by a purchaser of an outstanding obligation imposed upon property and the taking of title to the property by the purchaser subject to the outstanding obligation is well stated in Fidelity Union Fire Insurance Co. v. Cain, 28 S.W. 2d 833, 835 (Civ. App. 1930) as follows:

"The difference between a purchaser of land assuming a payment of a lien indebtedness thereon and in purchasing the land subject to such indebtedness is simply that, in the former case the purchaser becomes personally liable for the payment of the indebtedness while in the latter case no such personal liability exists."

In accordance with this legal principle it would be immaterial whether the insurance company executed its own note payable to the vendor in the sum of $250,000.00 or assumed the payment to its vendor of a note in the sum of $250,000.00 which had been executed by a third party, both notes being secured by a lien upon the property in question.

Where the home office building is conveyed to the insurance company subject to a previous indebtedness in the sum of $250,000.00, a different rule would prevail. In all three cases described, the indebtedness would constitute a burden upon the home office building, the latter constituting a primary fund for the discharge of such indebtedness. However, in the case of the company acquiring the title to the building from A subject to an outstanding indebtedness in the sum of $250,000.00 owing by A to B, which was secured by a lien upon the property in question, and which indebtedness the company did not assume to pay to B, it is our opinion that the investment made by the insurance company would be only in the amount of $250,000.00, the primary obligation to pay such indebtedness to B remaining in A, the maker of the note. In this connection it may be noted that although a deed may contain a clause that the land is purchased subject to the lien indebtedness, the use of other language in the deed may evidence an intention on the part of the purchaser to become personally liable for such indebtedness.

"6. ABC Life Insurance Company has total admitted assets of $500,000. An outside source makes a surplus contribution to the company of a home office building which is worth $500,000, and the Company carries the building as an admitted asset at this figure. Is this building an 'investment' which is prohibited by the statute because it exceeds 33-1/3% of the admitted assets of the Company? Or is it admissible as an asset because the Company has not expended or 'invested' any of its funds or accumulations to acquire the building? In other words, where an insurance company does not actually expend or 'invest' any of its funds or accumulations in an asset which would otherwise be prohibited by applicable statutes, should the Board consider the item just as though funds had actually been expended or invested therefor? Would it make any difference if the item was capitalized or remained as surplus?"

It appears from the above factual situation that the life insurance company has acquired as a contribution without the payment of any consideration therefor a home office building worth $500,000. Article 3.40 of the Texas Insurance Code as

amended in 1955, expressly allows a life insurance company to "secure, hold and convey" real estate only for the purposes and in the manner named and authorized in Article 3.40.   Section 1(b) of this Article provides a limitation on the "investment" that a company may make in home office property.  This provision makes the use of funds or assets of such a company in excess of the limits described improper.  Since, in the instant case, no funds or assets of the company have been used to acquire the property, there has not been an improper use of the company's funds, even though the contributed property exceeds the statutory percentages allowed.  In our answer to your Question No. 5, we have previously held that Section 1(b) of Article 3.40 not only prohibits the investment of funds in excess of the limits therein prescribed, but also prevents the company from showing as an admitted asset the excess by which such investment exceeds the permissible limits.  While the first impression may be that this restriction on the admissibility of home office property as an asset applies only to home office property acquired by way of investment, we do not believe such a construction properly reflects the legislative intent in the enactment of the amendments to Article 3.40 in 1955.  Section 1(c) of Article 3.40 is as follows:

> "The value of each such investment in the properties described in Paragraph 1(a) shall be subject to the approval by the Board of Insurance Commissioners; and the Board may, in its discretion, at the time such investment is made or any time when an examination of the company is being made, cause any such investment to be appraised by an appraiser appointed or approved by the Board, and the reasonable expense of such appraisal shall be paid by such insurance company and shall be deemed to be a part of the expense of examination of such company.  No such insurance company may hereafter make any increase in the valuation of any of the properties described in Paragraph 1(a) unless and until such increased valuation shall be likewise approved by the Board, subject to the limitations and conditions set out in Paragraph 1(b);"

The purpose of this section of Article 3.40 is to provide a mechanism for valuation of home office property.  It is true that in the first sentence of this section the description of the property is couched in the term of "an investment", but note should also be made of the last sentence of this section, wherein it is provided that any increases in valuation of "any of the properties described in paragraph 1(a)"  must be approved

by the board, "subject to the limitations and conditions set out in paragraph 1(b)". The property described in paragraph 1(a) is "one building site and office building" regardless of whether the same was acquired by means of investment in contrast with an acquisition by way of contribution. No reasonable argument could be advanced that the Legislature intended that the original evaluation of home office property acquired by means of contribution would not be subject to the admitted assets limitations of Section 1(b), while at the same time increases in valuation should be so limited.

It must be noted that the Legislature has not always used the term "investment" solely in the strict sense of property acquired by means of disbursement of funds or assets. One only need look at the provisions of Subsection (5) of Section 1 of Article 3.02 as amended by S.B. 12, 54th Legislature, 1955 (same bill amending Article 3.40), to see that this statement is correct. This provision is, in part, as follows:

"Such minimum capital and surplus shall, at the time of incorporation, consist only of lawful money of the United States, or bonds of the United States, or this State, or of any county or incorporated municipality thereof, or government insured mortgage loans which are otherwise authorized by this chapter, and shall not include any real estate; provided, however, that fifty (50%) per cent of the minimum capital may be invested in first mortgage real estate loans. After the granting of charter, the surplus may be invested as otherwise provided in this Code. Notwithstanding any other provisions of this code, such minimum capital shall at all times be maintained in cash or in the classes of investments described in this Article."

To give the term "invested" the restricted meaning would require that at the time of incorporation the minimum capital and surplus may, for instance, "consist" of government insured mortgage loans not necessarily acquired by investment, but that as to other first mortgage real estate loans, the company must have acquired such assets by means of a disbursement of its funds or assets. Similarly, in the last sentence quoted above, the Legislature has provided that the minimum capital shall at all times be "maintained in cash or in the classes of investments" described therein. Obviously, this provision was not intended to require the company to maintain its minimum capital in the form of assets which had been acquired by the disbursement of its funds or other assets. Clearly, the meaning here given to the term "investments" by the Legislature is synonymous with the terms "property" and "assets".

Similar treatment of the term "investments" and its related terms may be observed in Article 3.22 and Section 9 of Article 3.39, each of which provisions  were amended by Senate Bill 12 of the 54th Legislature, 1955, which is the same bill amending Article 3.40 here under discussion.

The restrictions embodied in Section 1(b), limiting the value of home office property which may be included by a company as an admitted asset, were placed in the law for no other purpose than to provide security for the policyholders and stockholders.  As these contributed assets will be used to make up the necessary reserves and other protection required by law for policyholders' and stockholders' benefit, we are of the opinion, in view of this fact and the foregoing discussion, that the contributed home office building in your fact situation may be shown on the statement of the company as an admitted asset only to the extent and percentage permitted by Section 1(b) of Article 3.40.  Any amount over the statutory percentages must be non-admitted as an asset, because the statutory protection to policyholders and stockholders is not available in this excess.

"7.  Article 2.08 provides that the capital stock and minimum surplus of a casualty company shall consist only of certain specific items.  The capital stock and minimum surplus of XYZ Casualty Company consists of cash, United States Government Bonds, several notes secured by first mortgages upon real estate, the title to which is valid, but the payment of which is not insured by the United States or any of its agencies, which is contrary to Article 2.08, and a number of notes secured by first mortgages upon real estate, the title to which is valid, and the payment of which is insured by the United States or one of its agencies, but the total amount of these insured notes exceeds 50% of the capital stock and minimum surplus of the insurance company, which is also contrary to Article 2.08. First, should the Board (1) allow the company to retain the uninsured notes, but non-admit them for financial statement purposes, or  (2) require the company to completely dispose of those notes which are not insured because they are not authorized by the statute, and thus are prohibited by it?  Second, in dealing with the insured notes, should the Board allow the company to retain these notes, but for financial statement purposes  (1) non-admit that amount of the notes that exceeds 50% of the capital stock and minimum surplus or  (2) non-admit the total amount of these notes because it exceeds 50% of the

capital stock and minimum surplus and is thereby pro-
hibited by the statute; or should the Board require
the company to (3) dispose of that amount of the notes
that exceeds 50% of the capital stock and minimum sur-
plus or  (4) dispose of the total amount of the notes
because it exceeds 50% of the capital stock and mini-
mum surplus, and is thereby contrary to the statute?"

Article 2.08, Texas Insurance Code, requires that the
capital stock and minimum surplus of a casualty insurance com-
pany shall consist only of certain items, one being notes secured
by first mortgages upon unencumbered real estate in Texas, the
title to which is valid and the payment of which notes is insured
by the United States of America or any of its agencies, provided
that the investment in such notes shall not exceed one-half of
its capital stock and minimum surplus.  Since the provisions of
Article 2.08 are mandatory, none of the uninsured notes should be
permitted to constitute a part of the capital stock or minimum
surplus, and only such insured notes as do not constitute more
than fifty percent of the capital stock and minimum surplus of
the company should be permitted to remain in that category.  The
Board should require such company to dispose of such property
and replace the same with property which meets the standards of
Article 2.08 for the investment of the capital stock and minimum
surplus, or require that such other steps be taken as will secure
compliance with the terms of Article 2.08.

It should be pointed out that Section 3, Article 2.10,
Texas Insurance Code, provides that a casualty company may invest
its funds over and above its capital and minimum surplus in first
mortgages upon unencumbered real estate, the title to which is
valid and the market value of which is not less than forty per-
cent more than the amount loaned thereon.  In view of this provi-
sion the uninsured notes secured by unencumbered real estate, the
title to which is valid and the market value of which is not less
than forty percent more than the amount loaned thereon, and the
insured notes in excess of fifty percent of the capital stock and
minimum surplus of the company may be retained by the company as
admitted assets provided they are not included in the financial
statement of the company as a part of the capital stock and mini-
mum surplus.

### General Comments

It is well settled law in Texas that the departmental
construction or interpretation of a statute by the officer, agency,
or department charged with its enforcement should be given great
weight in construing the statute involved.  However, this rule of
law is only applicable where the verbiage or phraseology of the
statute is ambiguous or misleading.  Departmental construction or

interpretation may not be looked to in construing a statute, the terms of which are clear and unambiguous.  Ramsey v. Todd, 95 Tex. 614, 69 S.W. 133, 136 (1902);  McCallum v. Retail Merchants Association, 41 S.W. 2d 45, 47 (Comm. App. 1931).

In our answers to questions 1, 2, 3 and 4, we have held that the departmental construction of the statutes in question by your predecessor Boards of Insurance Commissioners have been in error upon the ground that each of the statutory provisions involved is clear and unambiguous.  Our holding is based upon the phraseology contained in the first sentence of Article 3.39, Insurance Code, which states that "A life insurance company organized under the laws of this State may invest in or loan upon the following securities, and no other, . . ."  The foregoing language is clear and unambiguous and applies to any loan or investment made under subsections 1 to 8, inclusive, of Article 3.39, and is contrary to the departmental construction heretofore placed by the Board of Insurance Commissioners on the various subsections of Article 3.39 discussed in this opinion.

Recognition must be given to the fact that many investments and loans have been made by various companies in good faith compliance with the departmental interpretation or construction of the statutory provisions involved.  Also, since many of the limits discussed involve percentages which, in turn, relate to questions of value, there is much room for honest differences in opinion and judgment as to the propriety of any given investment.  While the final decision of the Board on these matters must be given effect, the Board is vested with sufficient discretion to extend the time limit for disposal or adjustment of the improper investment so as to prevent, or minimize, the injury which might attend an immediate or untimely disposition or adjustment of such investment.

Our answers as above set forth are further qualified as follows:  Although at the time of the investment the transaction was in violation of the provisions of the Insurance Code, if, by reason of changed conditions, such as an increase in the amount of the admitted assets or a decrease in the amount of indebtedness, or by virtue of other factors the present status is such that the transaction, if negotiated at the present time, would not be violative of the provisions of the Insurance Code, the insurance company should not be required to dispose of same.

Further, this office expresses no opinion on whether the investments described in your questions may or may not qualify as legal investments under some other provision of the law than the specific provisions of the Insurance Code mentioned in such examples.

## SUMMARY

A life insurance company may not invest its funds in the capital stock of any one corporation in excess of ten percent of the amount of its capital, surplus and contingency reserves.

A loan made by a life insurance company on real estate where the amount of the loan is equal to the total value of the real property securing the loan is improper and the company should be required to dispose of such asset or renegotiate or readjust the loan so that it meets the standards of Section 2, Article 3.39, Texas Insurance Code. For the purpose of determining the solvency of the company, that portion of the loan which meets the percentage requirements of the statute should be admitted until the company disposes of the loan or readjusts it.

A life insurance company cannot invest its capital, surplus and contingency reserves in the stock or commercial notes of any company which has not been in existence for a period of five years next preceding the date of such investment.

A life insurance company cannot invest more than five percent of its admitted assets in the debentures of a public utility corporation.

A life insurance company may invest its admitted assets in a home office under the provisions of Article 3.40 to the extent of its surplus and 33-1/3% (or 50% with permission of the Board) of its admitted assets to the extent of its capital, liability and reserves. The amount of such total investment in excess of 33-1/3% (or 50% with permission of the Board) of its admitted assets may not be included as an asset of the company for statement purposes. An investment in home office property in excess of these limits is improper and the company should be required to dispose of such investment or make such other adjustments as will bring the investment within permissible limits.

For the purposes of determining solvency of a company, that portion of its investment in home office property not in excess of 33-1/3% of its admitted assets should be admitted until the company

disposes of the investment or makes such other adjustment as will bring the investment within the permissible limits.

The term "investment" as used in Article 3.40 includes the total cash and notes, either executed or assumed by the company, that the company has given for the purchase price of such home office property.

Where an office building is contributed as surplus contribution to an insurance company without the payment of any consideration therefor by the company, such transaction is not improper though it exceeds the statutory percentages allowable under Article 3.40, but such property may be shown as admitted asset only to the extent and percentages allowed by said Article.

The capital stock and minimum surplus of a casualty company can only be invested in the items specifically named in Article 2.08, Texas Insurance Code.

The Board is vested with sufficient discretion to extend the time limit for the disposal or adjustment of improper investments so as to prevent or minimize the injury which might attend an immediate or untimely disposition or adjustment of such investment.

Although at the time of the investment the transaction was in violation of the provisions of the Insurance Code, if, by reason of changed conditions the present status is such that the transaction, if negotiated at the present time, would not be violative of the provisions of the Insurance Code, the insurance company should not be required to dispose of the same.

Yours very truly,

WILL WILSON
Attorney General of Texas

By  s/C.K. Richards
　　　C.K. Richards
　　　Assistant

　　s/Fred B. Werkenthin
　　　Fred B. Werkenthin
　　　Assistant

FBW:CKR:wb:wc

APPROVED:

OPINION COMMITTEE

Geo. P. Blackburn, Chairman
Mrs. Marietta McGregor Payne
William E. Allen
Houghton Brownlee, Jr.

REVIEWED FOR THE ATTORNEY GENERAL

BY:  W.V. Geppert